1932-72 Minnesota. I don't hear you if you said something. Sorry about that Your Honor. Can you hear me now? No, go ahead. I'm sorry. Okay. Case number 1932-72 Minnesota, Dr. Gregory Sherr v. HealthEast Care System et al. Hey, Mr. I'm Larry Schaefer, and I represent the appellant, Dr. Gregory Sherr. We're here because we're seeking reversal of the erroneous district court decision to dismiss the three tort claims at issue. The defamation claim and the two tortious interference claims on summary judgment. Now we have presented very, very detailed briefs with legal arguments, citations to the record that outline all of our arguments in support of why these three claims require trial while they can't be dismissed as a matter of law. I want to focus my comments to the court now on the defamation claim, and I want to focus more specifically on the defamation claim and the testimony of Dr. Dan Sipple in support of that claim. Dr. Sherr pled a detailed defamation claim. In it, he specifically described false statements he was aware of at the time. And in addition to these specific allegations, he pled, and I quote, upon information and belief, the physicians in the HealthEast Neuro Group have made other false and defamatory statements about plaintiffs. This is contained in paragraph 113 of the amended complaint, specifically in the defamation count. The HealthEast Neuro Group is defined in the complaint as comprised of Drs. Wallenfriedman, Dunn, and Gregory, three of the named defendants and three of the appellees in this case. Now, consistent with this pleading, Dr. Dan Sipple, the director of the HealthEast Spine Center, testified in his deposition that Drs. Wallenfriedman, Dunn, and Gregory told him that my client, Dr. Sherr, was a, quote, hack, quote, the worst goddamn surgeon ever, and, quote, dangerous, among other statements that were conveyed that were devastating to Dr. Sherr's competence as a surgeon. These statements, standing alone, could establish defamation liability, defamation per se actual liability, and require trial to resolve. The district court, however, dismissed these statements by placing a pleading burden on Dr. Sherr that cannot be supported by any reasonable interpretation of the rules of civil procedure or applicable precedent. And let me turn to that now. Now, there is nothing in the federal rules of civil procedure that requires defamation in particular to be pled with specificity, contrasted with Rule 9, which does require, you know, fraud and mistake to be pled with specificity. Defamation, though, is a unique claim. There's all sorts of privileges that can apply to defamation. So courts in this circuit and elsewhere have developed rules that require plaintiffs to plead defamation with some specificity. Given, however, the pleading that I described at the outset of these comments, Dr. Sherr has satisfied that burden, and there's no basis to require him to amend the complaint when Dr. Sippel testified in his deposition in the way that he did. And we've cited a number of cases- to Dr. Sherr as a hack, etc. Were those known at the time? Were those known to the plaintiff at the time the complaint was filed? Or were they- did some of these things- were they discovered later? Your Honor, they weren't known at the time of the complaint. Actually, Sippel was a subpoenaed third-party witness. The first time I met the man was at his deposition, and he made these statements. Your Honor, we've cited the cases, and both parties have cited the cases that talk about defamation pleading. And I want to focus on two of them. First, the Schabersky case, that's a District of Minnesota case, makes very clear that the elevated pleading requirement for defamation cases are for the purpose of determining if any kind of privilege may apply to the alleged defamation. Counsel, let me interrupt you before you go to the federal district courts, and I respect them, but doesn't the Minnesota Supreme Court- it's long Missouri, too, for what it's worth- say in defamation cases, the defamatory matter must be set out verbatim? Your Honor, that's exactly right. You're referring to the Marino case, Your Honor. And that was cited and discussed in, I believe, Schabersky and the Thompson cases, which we've cited in our brief. And what those cases say is, the exact language does not have to be pled in the brief. And in fact, Judge Doty in the Thompson case and in the Schabersky case, the ruling was basically, as long as you have made an allegation that identifies the defendants that have made the allegedly false statements, that's sufficient. That's a reasonable standard. Is the latest Minnesota State Supreme Court decision on this Marino case, is that their latest statement? I believe so, Your Honor. Okay, thank you. Proceed. Yes. And I also want to point out that accepting the defendant's ruling and the rationale for it here would exempt defamation claims from the general rule that claims conform to the federal rule of 56C. And it would actually go further. It would eliminate the use of depositions on rule 56 motions in defamation claims, contrary to the plain language of federal rule 56C. It would also, it also flies in the face of federal rule of civil procedure 8E, which requires pleadings to be construed so as to do justice. I also want to talk a little bit about the court's on the merits analysis, which I think is dicta, but in any event, it's not disputed by the parties that it's a question of law, whether an alleged slanderous statement is capable of implying false facts. Here, we've pointed out, and with the supporting case law, how a jury could readily find that describing a surgeon to another doctor as a hack, as dangerous, as the worst goddamn surgeon, infers facts capable of being proven false. This is especially so when the statement is made to a principal referral source in order to get him to change his referral patterns. Now, the cases that have been presented and argued to the court on this issue, this issue of as a matter of law, determinations of statements, talk about two things that matter, the content of the statement and the context in which it was uttered. Now, the court dismissed this looking at the content alone. It didn't even consider the context of this statement, made too simple to deter his referral patterns. That's error, and I want to talk also in the time I have remaining about the errors committed below that go beyond this, and I want to talk about the errors that were committed in relation to granting immunity on both the federal and state court grounds, because that error is critical. If that immunity stands, the tortious interference claims cannot go forward because the summary suspension is the basis for claiming the harm in those claims. Now, it's clear what the immunity is governed by under state law. It's the Minnesota Peer Review Statute, and under federal law, it's the Healthcare Quality Immunity Act. The Minnesota statute says that immunity applies unless malice is proven, and the Healthcare Quality Immunity Act has set up what's been developed by the courts as a rebuttable presumption. There are four safe harbors that are presumed to have met, and we, Dr. Schur, has the burden of proving that any one of those safe harbors haven't been met here. The standard this court applies is an objective one, and we recognize that, and what that means is it doesn't matter that the doctors in the peer review may have been Schur's competitors and may have been on a witch hunt to get him out of the hospital. None of that standing alone can allow a malice-finding, defeating immunity, but let me talk about the evidence that we have that goes far beyond that. I want to highlight in particular what happened between August 6th, or excuse me, October 6th and October 20th, culminating in what happened in October 20th, 2015. Those are the two meetings of the Spine Council, the Spine Council that Dr. Wallen-Friedman chaired that were intended to address the issue of these infections that had arisen for Schur, which he doesn't dispute occurred. These involved initially two cases, and then six more were added, but on October 6th, Dr. Sinekropi, the president of MSBI, as well as his partner, Glenn Butterman, and Dr. Schur were present at the Spine Council meeting to discuss every one of these cases, to talk about this infection issue and what was the best way for the Spine Council to address it. Dr. Sinekropi has testified, and the record fully supports this, that there was an agreement that the best way to approach the issue of these infections was a proctoring plan for Schur. Dr. Sinekropi was specifically tasked, along with his group, to develop this proctoring plan. There's actually voting recommendations that are in the record that we've cited that show the support for this proctoring plan, and there is not a mention at all in those voting recommendations about immediate termination. Now, what happened? Dr. Wallen-Friedman, who's the chair of that council, was responsible for ensuring a fair review of these issues. Sinekropi wasn't invited to the next meeting. She set the meeting on the 20th, and he wasn't there. He wasn't there because, contrary to every other Spine Council meeting that occurred throughout his tenure that he had been invited to, they sent Wallen-Friedman and her group, the Spine Council, sent an email to him at address that never existed. He never got it. He wasn't there. Now, that meant, and MSBI had done a proctoring plan. They were ready to present it, pitch it to the group, and talk about how this was going to address the issues with Schur. The fact that he wasn't there meant none of that happened. I'm getting close to my rebuttal time, and I think what I'm going to do, Your Honors, is reserve it. You're welcome the rest of my time so that I can address some of these issues. You do that. Thank you. Thank you. Ms. Stilson. Good morning, Your Honors. My name is Jamie Stilson, and I represent the defendant appellees in this matter, HealthEast, as well as four individual physicians, three of them who are neurosurgeons, Dr. Wallen-Friedman, Gregory, and Dunn, as well as Dr. Kohler, who at the time of the events in this particular lawsuit was the chief medical officer for HealthEast and was involved in the determination with respect to Dr. Scheer's privileges. At the core, the central premise of Dr. Scheer's case, that there was some sort of concerted effort to oust Dr. Scheer through the peer review process, is simply not supported by the undisputed facts in this case, is not sufficient to overcome the immunity that's afforded to HealthEast and its physicians when engaged in a peer review process, and is not otherwise supported by the law. Dr. Scheer, in asking you to reverse the district court's well-reasoned opinion in this case, is asking that the court ignore what immunity is designed to protect, and it's a very important immunity that is set forth both in the Minnesota statute as well as the federal statute. It recognizes that it is not the province of the courts to look at whether or not physicians are appropriately monitoring their peers through the peer review process. There is simply no support for a finding of malice in this case. So I want to go back a little bit just to remind the court about the facts that led to the decision to engage in a peer review process. Dr. Scheer first arrived, was first granted privileges at HealthEast in February of 2015 on an emergency basis. He was granted full privileges, I believe in April of 2015, and the record, it is undisputed, shows that in the course of several weeks over April, May, and June, in rapid succession, there are a number of patient complications with respect to Dr. Scheer's surgeries, significant, serious complications. Those complications were not, as Dr. Scheer argues, without any support in the record. It simply is undisputed that those cases came to the Spine Council, which is the operative peer review body that began the peer review process that Dr. Scheer was able to afford himself of through HealthEast's policies, were not raised by Dr. Wallen-Friedman. They were the result of safety reports and a blind study of post-surgical site infections and very concerned about the infection rate and the incidences for a physician in such a short period of time, and so the study was unblinded. Ultimately, there were eight cases, eight cases with serious complications that were submitted to the peer review process. At every step of the way, it is undisputed, objectively, and the standard is objective, that the process was followed and it was fair. The cases were reviewed by individual physicians, other neurosurgeons, not just the three here. The key here you agree under all the cases is how well you followed the procedures, right? Correct. Okay, great. What about this email that's sent to the person that would represent the group that never got to that person? You violated a procedure. It is undisputed, however, that that was a clerical error. I think that's to the subjective. All the cases say the subjective does not matter. You can even have a really bad motive. I know it's called malice, but that's what they say, and the key is about following the procedure. So how close is it to following the procedure? All right. So, Your Honor, I would submit that that clerical error is not actually a violation of the procedure. The procedure is that there is to be a meeting. Whether or not all the physicians are able to attend that meeting or not, the process requires that it be fair. There were eight voting members on October 20th. All eight unanimously voted. Even if Dr. Sinecropy had been there and he had voted against it, it would not have changed the recommendation. What is the total number that the eight is of? It depends. I believe that at the original meeting there were 11, and so it would have carried over from the October 6th meeting. Doesn't this committee have a set membership of some kind? Anyone who is a practicing neurosurgeon is invited to the meetings. How many were invited? Now you're getting to a number. How many were invited? I don't recall off the top of my head how many were invited. I know, however, that on October 6th there were 11 physicians present at the first meeting, and there were at least eight who had been invited to review each of the eight cases. One of them, by the way, was Dr. Scheer's colleague at MSBI, Dr. Butterman, and he didn't appear. In any event, the basis for Scheer's claims is the summary suspend decision. Dr. Kohler, who is the chief medical officer at HealthEast, it is undisputed that he made the decision, and he alone under HealthEast's bylaws, to do a summary suspend because he was so disturbed by the evidence that was presented during the two hearings with respect to Dr. Scheer's complications that he believed that patients were with an imminent harm. That process under the bylaws was followed. He had the authority to do the summary suspend. He was delegated that authority by the CEO of HealthEast, and he exercised it. That is following the policy. Just two days later, Dr. Scheer had an opportunity, again, fair process, to have that decision heard by the Medical Examiners Committee. So that's the MEC. Counsel, couldn't a fact finder, a reasonable fact finder, find here that the chairperson of the committee had an anti-competitive motive? It's very clear, both in the policy as well as the law, that the fact that another member of the community is not met. And in fact, that suggests a subjective... That's not really answering my question. Couldn't a fact finder find that the chairperson of the committee had an anti-competitive motive based on statements that were made complaining about Dr. Scheer getting referrals, that the referrals should go to the hospital's staff doctors? And other statements that the chairperson made, and just the fact that they were competitors. No, Your Honor. Couldn't that be found to be? I know you disagree with it, and you would argue otherwise, but couldn't it be found that there's an anti-competitive motive there? Your Honor, I would submit that that's actually the wrong question. The question here with respect to malice, and whether or not something is objective... Well, what's the answer to that question? What's the answer to that question? And then you can tell me what the correct question should be, but what's the answer to my question? Sure, you could find that. I'm not disputing that fact, but there, that's a subjective inquiry. This is about process. It's not about whether or not Dr. Wallenfriedman may have had some sort of bad faith motive. The law's very clear on this. Sugar Baker from this court states that. I'd like to move on, if that's okay with Your Honors, to talk a little bit more about some of the defamation claims. Before you leave that, doesn't Health East Policy provide that the review organization chair has discretionary authority to limit participation based on anti-competitive motives? It does. It does state that, and it's discretionary, so she may. Well, why didn't she exercise that discretion here? What's the evidence on that? She didn't have to. It wasn't required by the policy. And there is evidence in the record that, despite Dr. Scheer's suggestions otherwise, that none of the three doctors here were motivated by any sort of referral system, and it's undisputed that that was not an issue. Moving on to the defamation claim, I do want to rate, I do want to go back to something that or excuse me, that Mr. Schaefer raised at the outset, which is the scope of his defamation claim. Despite his arguments about the basis for the number of defamatory statements that should be submitted to a jury in this case, he ignores very clear precedent in both Minnesota and this You must set forth with specificity the defamatory statements that are at issue. It is undisputed that the only specific statements that appear in the complaint are three. I've got to interrupt you. What about the district court cases that almost say the opposite? It is not necessary for the complaint to recite the exact language spoken. I'm quoting the district court of Minnesota, I think, a couple times. That's contrary. What do we do? So those cases are clearly distinguishable from this one here, and I think you're referring to First of all, pay attention to the words. Those words are not distinguishable. You agree? I agree. I agree with that. It does not require specificity, but it does require that you identify who the speakers are and, most importantly, the content of the statement. The content of the statements, the statements that Scheer was a hack or that Scheer was a bad doctor or that Scheer was dangerous appear nowhere in the complaint. That is undisputed. He didn't. And despite what Mr. Schaefer argues to this court, there was no good cause for his failure to identify those statements. Yes, he may have learned them in discovery. They were not until HealthEast and the individual at police here raised it on summary judgment after the factual record had closed. This issue was litigated below. They lost in front of the magistrate judge, chose not to appeal it to the district court, and they have waived that issue. Those statements are not in the complaint. In the district court case I was quoting, which is Eagle Nursing Home, do you know why the district court can later say the You know why there's that equivocation? Because you don't have to plead the exact language, but what was said is what you know the facts of that case enough to answer that. Go ahead. I do, Your Honor. And what was said in that case was that she was a terrible nurse. Right. So it's actually exactly like this case here. The statement that Scheer was a bad doctor appears nowhere in the complaint. The content of the statement that Dr. Scheer now wants to submit to a jury appear nowhere in the complaint. There's only three, and all of those three we would submit don't support a defamation claim for other reasons, but with respect to the statements about being a bad doctor, hack, etc., none of them appear in the complaint. I'd like to also address very briefly the fact that many of the statements, and again the ones that Dr. Scheer would like to submit to a jury here, are absolutely under well-established Eighth Circuit law and law all over the country that they are non-actionable opinion statements. That, you know, statements that Dr. Scheer was a bad doctor, etc. What about the context of those statements? I think that sort of the line he's trying to draw here is that these statements are made in a very specific context about a very specific activity, which is his abilities as a doctor, from one doctor to another, and that those have factual connotations in that context. Why isn't that enough? Because I think that there are other factors that the court is supposed to consider, which is whether or not the statements are precise enough to actually be submitted to a jury to determine if they're true or false. There's actually an opinion out of the Seventh Circuit, Sullivan, that's really explanatory on this point in an analogous context with respect to a lawyer, right? So, if you say that someone is a bad lawyer, that's very imprecise, that's unverifiable. Now, if the statement were different, if you said that the lawyer always lost all his or her cases, then that's a fact, that's a fact that can be verified, that can be proven false. Whether or not someone is a bad doctor, by its very nature, regardless of the context, is something that cannot be proven true or false. So, we can't disregard the other factors that the court, as a matter of law, under Thomas and other precedent, is supposed to look at. Well, in discovery, who made, where did those statements come from? Who made those statements? Your Honor, those were statements that were made at deposition, as Mr. Schaefer said, by Dr. Sippel. And again, I would point your honors to the fact that they never made it into the complaint. Some of them we submit are non-actionable on other grounds there. It's certainly that they weren't in the complaint, but their opinion, their absolutely pure opinion, there's a plethora of cases holding in very analogous circumstances that that's the case. And I see, Your Honor, that I'm out of time. Yes, but be sure, Judge Shepard, you had a sufficient answer to your question. That's fine. Okay, thank you for your argument. Mr. Schaefer, we're back to you. Thank you. I want to, obviously, be brief. I have a very, just three minutes, but I want to mention a couple of things. First thing, one of the things that Dr. Wallen-Friedman did throughout the peer review process was inject extraneous, non-relevant information into the process and poison decision makers, particularly Kohler. We have a site on page 15, footnote 10, of our brief where we talk about Wallen-Friedman bringing to Kohler's attention a medical malpractice case that had been dismissed, but claiming that Dr. Scher should have disclosed that on his initial privileges, falsely claiming that. Counsel, generally, medical practitioners have to disclose even charges against them, right, to some national database, even if almost nothing happens on them, right? Your Honor, and we can get, I don't want to get lost on the issue of that. Perhaps it's something... Go ahead. Go ahead. I want to correct the record because we quoted Krasnicka's deposition, and it's Kohler's, and it's the appendix at pages 167 to 171 of Kohler's deposition. This poison, Kohler's attitude towards Scher, had nothing to do with the peer review process. Kohler actually testified he thought it led to, in part, the summary suspension. The Islami decision, which is the one decision we cite on, we cite repeatedly, quote, and we are relying on. It's a decision out of the Northern District of Iowa. The Islami court, in facing not as egregious circumstances as here, denied immunity as a matter of law to the Covenant Medical Center, and in doing so, one of the things the court relied on in Islami was how the hospital leadership reacted after things were brought to their attention during the process that they were doing wrong. Your Honor, you pointed out correctly that not inviting Sinekropi to that meeting was a violation of policy, regardless of why it happened. But what happened after that, when Sinekropi said just that, this is crazy, I'm the one who's doing a proctoring plan for this guy, you have to rescind this, you've got to reschedule this meeting, you've got to give me a voice and let me convince these folks that the proctoring plan, as we agreed on the meeting of the 6th, is the right way to go. They ignored that completely. They instead pulled forward with the Medical Executive Committee two days later and didn't allow Sinekropi to even present to the Medical Executive Committee on Scher's behalf. This is how decisions like these get made. This is actual evidence of malice, failing to follow procedures, and the H. Kiowa standards, which above all else, require fairness and a reasonable belief that you're doing things in the interest of patient health. Those cannot be satisfied as a matter of law on this record. Thank you. Thank you both for your arguments. Case number 19-3272 is submitted for decision by the court. You're of course excused.